**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

**THOMAS J.,**

                **Plaintiff,**

      **v.**                              **Civil Action 1:24-cv-00048**
                                               **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF**
**SOCIAL SECURITY,**

                **Defendant.**

## OPINION AND ORDER

Plaintiff, Thomas J., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, the Court **OVERRULES** Plaintiff's Statement of Errors (Doc. 10) and **AFFIRMS** the Commissioner's decision.

## I.    BACKGROUND

Plaintiff filed his applications for DIB and SSI with a protective filing date of December 15, 2020, with an amended alleged onset date of March 26, 2020, due to posttraumatic stress disorder (PTSD), anxiety disorder, bipolar disorder, shoulder problem, back problem, and a learning disability. (R. at 201–11, 229). After his applications were denied initially and on reconsideration, Administrative Law Judge Cristen Meadows (the "ALJ") held a telephone hearing on April 13, 2023. (R. at 43–67). The ALJ denied benefits in a written decision on May 3, 2023. (R. at 17–41). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1–6).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 31, 2024 (Doc. 1), and the Commissioner filed the administrative record on March 26, 2024. (Doc. 7). The matter has been briefed and is ripe for consideration. (Docs. 10, 11, 12).

## A.    Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's statements to the agency and the testimony from the administrative hearing as follows:

> During the hearing, [Plaintiff] testified that mental health issues primarily prevent him from working. Among other things, he reported short and long-term memory problems, difficulty around others, isolative behavior, dislike of crowds, difficulty accepting criticism, anxiety, several PTSD-related symptoms, depressed mood, low energy/motivation, and lethargy. He reported a history of abuse as a child. [Plaintiff] testified that he takes several prescribed psychotropic medications with no adverse effects. He acknowledged that medication helps his mood stable. [Plaintiff] also stated he continues to take prescribed Methadone and did not report any use of illicit drugs for several months. He also testified that he continues to receive care at Crossroads including pharmacological management sand outpatient counseling.
>
> ***
>
> As for daily activities, [Plaintiff] said that he lives with his wife and two adult children. He explained that he was essentially homeless. He said he and his wife are separated and she lets him live at her home. He said that his driver's license was currently suspended. He claimed that he spends much of his time in bed due to depressive symptoms.
>
> As for work-related activities, [Plaintiff] reported limited exertional ability secondary to respiratory problems including difficulty walking or lifting. He also described several environmental sensitivities. [Plaintiff] also alleged a poor memory, poor stress tolerance, difficulty interacting with others, difficulty accepting criticism, poor energy/motivation, and a slow work pace.
>
> Initially, [Plaintiff] claimed that he last work in March 2020 as a laborer on a part-time basis. He further insisted that he had not done any type of tree trimming work since 2020. When asked about inconsistent records suggesting more recent work as tree trimmer, [Plaintiff] claimed to have a poor memory for dates. ***

(R. at 30–31).

B.      **Relevant Medical Evidence**

The ALJ summarized the medical records as to Plaintiff's mental health impairments as

follows:

*** [O]n July 21, 2017, about four months before the original alleged onset date, [Plaintiff] was admitted following a heroin overdose (Exhibit 6F/3). At admission, [Plaintiff] reported several situational stressors (*Id.*). A drug screen during this time was positive for both opiates and cocaine (*Id.* at 5). At admission, he claimed that he had purposefully overdosed in a plan to kill himself (*Id.*). He reported worsening depression over the past six months, self-isolation, and several other depressive symptoms (*Id.*). He also descri[b]ed PTSD-related issues stemming from experiences while in prison and several stressors including financial difficulties and learning that his separated wife had cancer (*Id.*). He denied any history of inpatient psychiatric hospitalization and reported one prior suicide attempt by overdose (*Id.*). He also reported that he had recently relapsed on cocaine, which is his drug of choice (*Id.*).

Clinical findings at admission were generally benign, especially given the circumstances leading up to the examination. Among other things, the examining psychiatrist, Dr. Ahmed, MD, noted that [Plaintiff] was pleasant and cooperative with a good affect, but a described "down" mood (*Id.* at 5-6). Dr. Ahmed noted an intact memory, no signs of psychosis, and fair judgment (*Id.* at 6). He assessed major depressive disorder, PTSD, cocaine and opiate abuse, and substance-induced mood disorder (*Id.*). He started [Plaintiff] on several psychotropic medications and admitted [Plaintiff] for inpatient care (*Id.*).

[Plaintiff] was discharged on August 2, 2017 (*Id.* at 3). Records shows that [Plaintiff]'s depression resolved with medication management (*Id.*). He acknowledged that he was using opiates on the street and explained that he wanted to restart outpatient treatment at Beacon Health (*Id.*). Clinical findings at discharged described a euthymic mood and appropriate affect with no current reported thoughts of self-harm and no signs of psychosis (*Id.* at 4). He was discharged in stable condition with instructions to follow-up at Beacon Health (*Id.*). Since this incident several months prior to the alleged onset date, the evidence of record has not documented any renewed complaints of suicidal ideation, nor has any mental health provider indicated such concerns.

On September 27, 2017, [Plaintiff] was seen at Beacon Health (Beacon) during a routine medication management visit (Exhibit 1F/21). At that time, Nurse Sanders, PHMNP-BC, indicated a history of polysubstance abuse, including cocaine, alcohol, and opioids (*Id.*). [Plaintiff] reported that prescribed Remeron was making him tired in the morning but denied thoughts of self-harm (*Id.*). He also acknowledged some current cocaine use (*Id.*). Nurse Sanders noted a tired mood, but with a full affect, no indication of psychosis, normal behavior, no signs of

physical deficits, and no extraordinary adverse effects from medication (*Id.*). She recommended some medication adjustments and characterized [Plaintiff']s [] mental state [as] "moderately ill" (*Id.* at 22, 24). She referred to diagnoses of PTSD and polysubstance abuse (*Id.* at 23). Records show that [Plaintiff] was prescribed aripiprazole, bupropion, mirtazapine, and Vistaril (*Id.* at 24).

On November 11, 2017, Mr. Zavasky, LPCC, a counselor at Beacon saw [Plaintiff] (*Id.* at 44). He noted a blunted affect, monotone speech, and intense eye contact at times (*Id.*). Mr. Zavasky noted that [Plaintiff] was mostly passive during the session and preoccupied with [the] conflict with his employer (*Id.*). Several subsequent sessions with Mr. Zavasky over the next few months do not dramatically differ in terms of findings or complaints with [Plaintiff] alluding to current cannabis use (*Id.* at 52, 64).

Along with routine counseling, Beacon records also document [Plaintiff] continued to receive intermittent medication management from Nurse Sanders over[ ] the next several years. These visits were relatively unremarkable and not suggestive of the need for total work preclusion. For example, during a routine visit in late January 2018, [Plaintiff] reported that he had run out of Vistaril (*Id.* at 60). He reported increased anxiety and restlessness after claiming that he had recently been accused of being a snitch on the streets; however, despite this situational stressor he also said that sleep was generally good (*Id.*). He also reported no illicit drug use for the past three months due to financial difficulties (*Id.*). He reported some cravings and explained that he used coping skills to manage these cravings (*Id.*). While Nurse Sanders noted some difficulty focusing while completing paperwork, her clinical findings were generally benign including noting no overt physical issues, no mood or affect abnormalities, no indication of psychosis, good memory, no cognitive deficits, and a generally "ok/fair" attention and concentration (*Id.* at 60-61). She indicated several diagnoses including PTSD, opioid dependence, cocaine dependence, and alcohol dependence (*Id.* at 61-62).

Following her generally unremarkable visit in January 2018, Nurse Sanders did not see [Plaintiff] again until late February 2019 (*Id.* at 71). [Plaintiff] said that he had been arrested and spent a portion of the past year in jail (*Id.*). He reported that he was now living at a group home called Lake House (*Id.*). [Plaintiff] reported recent irritability after stopping Abilify, but with "pretty decent" sleep, good motivation, and "ok" energy (*Id.*). He also denied having cravings or desire to use illicit drugs (*Id.*). During this visit, Nurse Sanders observed that [Plaintiff] was cooperative with an "OK" mood and fund of knowledge (*Id.* at 72). She also observed no cognitive deficits, an intact memory, and no attention/concentration deficits (*Id.* at 71-72). She indicated that [Plaintiff]'s mental state was stable on his current medication regimen and assessed bipolar I disorder and PTSD (*Id.* at 73).

At their next visit a few months later, on May 22, 2019, [Plaintiff] reported that his mood was a little depressed and he was a little sad (*Id.* at 79). However, he also described good energy, fair motivation, and denied having panic attacks (*Id.*). He

reported a recent methamphetamine relapsed, but [Plaintiff reported] that the has been sober for the past month (*Id.*). Clinical findings at that time were again relatively unremarkable and inconsistent with the need for work preclusion mental limitations. Among other things, Nurse Sanders noted that [Plaintiff] was friendly and cooperative, with a full affect, no signs of psychosis, and intact attention and concentration with no cognitive deficits described (*Id.* at 80-81). Nurse Sanders referred to PTSD, generalized anxiety disorder and that several substance dependence disorders within early remission (*Id.* at 81-82). She noted that [Plaintiff] had recently been discharged from Lake House and was living with his mother. She indicated that [Plaintiff]'s PTSD and anxiety were well managed with his current medication regimen and made no changes (*Id.* at 82).

Nurse Sanders saw [Plaintiff] again in early April 2020, a month after the amended alleged onset date (*Id.* at 88). During this visit, he reported a "pretty good" mood with good energy, fair motivation, good appetite, good sleep with no nightmares, no thoughts of self-harm, "not too bad" anxiety, no panic attacks, and no irritability (*Id.*). He reported that he was maintaining sobriety from all illicit drugs, but that he had had a couple alcoholic drinks since being released from prison (*Id.*). [Plaintiff] stated that prescribed psychotropic medication was beneficial and denied having any adverse effects from medication (*Id.*). Clinical findings during this visit were generally benign and largely unchanged when compared to earlier exams (*Id.* at 8990). Nurse Sanders indicated that depression and anxiety were well controlled with current medication regimen (*Id.* at 91). Such unremarkable visits do not support the need for total work preclusion.

\*\*\* [Plaintiff] spent time in prison in 2019 and 2020. Prison records during this period submitted for review were generally routine in nature with references to a myriad of psychological disorders (See e.g., Exhibit 7F/14), but with essentially no documented mental health treatment and no significant clinical findings, as these records appeared focused on acute medical concerns. \*\*\*

In October 2020, [Plaintiff] began to receive substance abuse and mental health treatment at Crossroads Center (Crossroads) (Exhibit 3F/9). [Plaintiff] explained that he wanted to pursue methadone treatment and outpatient counseling services for substance use disorder and mild depressive symptoms (*Id.* at 17). He reported an extensive criminal history related to drug use (*Id.*). Clinical findings noted a normal memory, and that [Plaintiff] was cooperative during this visit with an elevated mood and anxious affect (*Id.* at 16-17). He received diagnoses of opioid use disorder, cannabis use disorder, major depressive disorder, and tobacco use disorder (*Id.* at 19).

Later that month, on October 20, 2020, Dr. Soria, MD, a psychiatrist, created a treatment plan (Exhibit 5F/6). At that time, Dr. Soria observe a normal affect, calm mood, and attentive behavior (*Id.*).

[Plaintiff]'s mental state responded well to treatment and sobriety. For example, records from Crossroads in early January 2021 noted a stable mood and recent unremarkable drug screens (Exhibit 5F/19). During this visit, [Plaintiff] stated that his work as a tree climber continued but work has slowed down due to the winter season (*Id.*). As discussed above, [Plaintiff]'s apparent work activity during the period at issue strongly suggests greater retained vocational ability than alleged, especially given ongoing unremarkable mental health records including a February 2021 visit when [Plaintiff] reported that he had quit smoking marijuana and that methadone was helpful (Exhibit 3F/29).

(R. at 27–29).

### C.    Relevant Medical Source Opinions

The ALJ summarized the medical source opinions as follows:

On June 24, 2021, Dr. Kincaid, Psy.D., a licensed psychologist, evaluated [Plaintiff] in connection with the instant applications (Exhibit 4F). During the evaluation, [Plaintiff] reported a number of mental health concerns including low mood, low motivation, sleep problems, appetite problems, anxiety, exposure to trauma while in prison, several PTSD-related issues, anger issues, chronic worry, and poor concentration (*Id.* at 2). [Plaintiff] declared that his anxiety has been present since childhood and that his trauma symptoms began while in prison after being stabbed (*Id.*). He said that he has required four inpatient psychiatric stays but denied any recent medication management or outpatient counseling (*Id.* at 2, 4). Of note, the record documents one prior inpatient psychiatric care several months prior to the alleged onset date secondary to a heroin overdose/claimed suicide attempt (Exhibit 6F). Since the alleged onset date, [Plaintiff] has consistently denied having current thoughts of self-harm. He said that he takes methadone for chronic pain (*Id.* at 4). He also claimed that he had not used marijuana or cocaine in four years (*Id.*). He described an extensive legal history and reported difficulty working with others (*Id.*).

Contrary to his claims made to Dr. Kincaid, mental health treatment records suggest more recent illicit drug use than reported. For example, a March 2021 urine drug screen was positive for THC and fentanyl (Exhibit 5F/3, 5). In addition, during this evaluation, [Plaintiff] also claimed that he had not worked in three years; however, as discussed in detail under Finding #2, [Plaintiff] has reported work during much of the period at issue.

As for daily activities, [Plaintiff] acknowledged that he could care for his own personal hygiene needs independently (*Id.* at 4). He claimed to have some difficulty cooking, cleaning, or running errands due to chronic pain and anxiety (*Id.*).

Dr. Kincaid observed a relatively benign mental status examination inconsistent with the need for total work preclusion. Among other things, he noted that

[Plaintiff] was cooperative with logical thought process, an appropriate affect, and anxious mood (*Id.* at 2). Dr. Kincaid also indicated an intact memory and no cognitive deficits (*Id.* at 3-4). Ultimately, Dr. Kincaid assessed major depressive disorder, PTSD, and generalized anxiety disorder (*Id.* at 3).

(R. at 30).

### D.     The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirements through March 31, 2022, but not after.  (R. at 23.)  The ALJ found that Plaintiff has not engaged in substantial gainful activity since March 26, 2020, his amended alleged onset date of disability.  (*Id.*).  She determined that Plaintiff suffered from the severe impairments of major depressive disorder; posttraumatic stress disorder (PTSD); anxiety disorder; substance use disorder; and chronic obstructive pulmonary disease (COPD).  (*Id.*).  The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment.  (R. at 24).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

After careful consideration of the entire record [the ALJ] finds that [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except as follows: He must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation; he can perform simple, routine tasks and make simple work-related decisions; he is limited to low stress jobs, defined as jobs with only occasional decision-making required and only occasional changes in the work setting or duties; he cannot perform work requiring a specific production rate, such as assembly line work or work that requires hourly quotas; and he can occasionally interact with the general public, coworkers, or supervisors, but with no joint tasks and no over the shoulder supervision.

(R. at 26).

Upon "careful consideration of the evidence," the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ."  (R. at 32).

Relying on the vocational expert ("VE")'s testimony, the ALJ concluded that Plaintiff is

unable to perform his past relevant work as a tree trimmer. (R. at 34). Considering his age, education, work experience, and RFC, the ALJ found that jobs exist in significant numbers in the national economy that Plaintiff can perform, such as a price marker, cleaner, or mail room clerk. (R. at 34–35). Consequently, the ALJ concluded that Plaintiff has not been disabled within the meaning of the Social Security Act since March 26, 2020. (R. at 35).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990)); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id..* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff alleges two assignments of error: (1) the ALJ erred at Step Three in evaluating whether Plaintiff's impairments meet or equal Listings 12.04 and 12.06; and (2) the ALJ did not

properly evaluate the opinion of consultative psychologist Christine Kincaid. (Doc. 10 at 9–19). Both errors, says Plaintiff, result in the ALJ's ultimate RFC determination being unsupported by substantial evidence. (*Id.*). The Commissioner maintains that the ALJ properly evaluated both the record at Step Three and Dr. Kincaid's opinion. (Doc. 11 at 4–17).

### A. Step Three Analysis

Plaintiff first alleges that the ALJ erred at Step Three by failing to find that he met or equaled the requirements of Listing 12.04 and 12.06. (Doc. 10 at 11–18). At Step Three, the ALJ must compare a claimant's impairments to an enumerated list of medical conditions that the Social Security Administration has deemed "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 404.1525(a). Each listing describes "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c)(3). Plaintiff's impairment must meet every element of a Listing before the Commissioner may conclude that he is disabled at step three of the sequential evaluation process. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify."). It is insufficient to come close to meeting the conditions of a Listing. *Higgins v. Comm'r of Soc. Sec.*, No. 2:17-CV-1152, 2018 WL 5283940, at *4 (S.D. Ohio Oct. 24, 2018), *report and recommendation adopted*, No. 2:17-CV-1152, 2018 WL 6046319 (S.D. Ohio Nov. 19, 2018) (citing *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989)). It is Plaintiff's burden to provide sufficiently complete and detailed medical evidence to enable the Secretary to determine whether all a Listing's elements are met. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986). "'Because satisfying the listings yields an automatic determination of disability . . . the evidentiary standards [at step three]

. . . are more strenuous than for claims that proceed through the entire five-step evaluation.'" *Bianchetti*, 2018 WL 3873577, at *4 (alterations in original) (quoting *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014)).

Plaintiff asserts that the ALJ committed reversible error when determining his mental impairments did not meet or equal two Listings. Listing 12.04 establishes the criteria for depressive, bipolar, and related disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. Listing 12.06 establishes the criteria for anxiety, and obsessive-compulsive disorders. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. To satisfy either Listing, Plaintiff must show: (1) the impairment-specific medical criteria in paragraph A; and (2) the functional limitations criteria in paragraph B or paragraph C. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)(2). In other words, Plaintiff must show he meets either paragraphs A and B, or paragraphs A and C.

When considering the Paragraph B criteria, an ALJ uses a five-point scale (none, mild, moderate, marked, and extreme) to rate a claimant's degree of limitation in the four following areas of mental functioning: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; (4) adapt or manage oneself. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(A)(2)(b). To satisfy Paragraph B criteria for both 12.04 and 12.06, an ALJ must rate a claimant as having extreme limitations in one of these four areas or marked limitations in two of them.

Of Listings 12.04 and 12.06, the ALJ determined.

The severity of [Plaintiff]'s mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04, 12.06, and 12.15. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in one extreme limitation or two marked limitations in a broad area of functioning. An extreme limitation is the inability to function independently, appropriately, or effectively, and on a sustained basis. A marked limitation is a

seriously limited ability to function independently, appropriately, or effectively, and on a sustained basis.

The record supports a finding that [Plaintiff]'s mental impairments are associated with no more than moderate limitation in his ability to understand, remember, or apply information; no more than moderate difficulty interacting with others; no more than moderate difficulty maintaining concentration, persistence, or maintaining pace; and no more than moderate difficulty in his ability to adapt or manage himself.

In making these findings, I considered the June 2021 psychological consultative evaluation report completed by Dr. Kincaid (Exhibit 4F and described in detail below). Based on his observations and [Plaintiff]'s subjective reporting, Dr. Kincaid referred to deficits suggestive of the need for "paragraph B" limitations (Exhibit 4F/5). He indicated that [Plaintiff] would have no difficulties regarding understanding, remembering, or carrying simple instructions (*Id.*). He also indicated "marked" impairment in [Plaintiff]'s ability to sustain concentration and complete tasks along with "marked" difficulties interacting with others in a work setting and responding to work-related stresses (*Id.*).

I find this assessment no more than partially persuasive. Dr. Kincaid's concerns must be viewed with a grain of salt given the relatively unremarkable nature of his clinical findings in this report along with generally benign mental health treatment records dating back to the alleged onset date. Further, reports from [Plaintiff] made to Dr. Kincaid were inconsistent with his longitudinal treatment records, including claims made by [Plaintiff] that he had not taken any illicit drugs for four years and that he had not worked in three years. As discussed in detail below, both of these claims are inconsistent with [Plaintiff]'s longitudinal treatment records including records dating only a few months before Dr. Kincaid's evaluation. Such factors strongly suggest that Dr. Kincaid's overall conclusions rely quite heavily on subjective reporting made by [Plaintiff], as opposed to clinical evidence. Consequently, Dr. Kincaid's opinion is no more than partially persuasive and represents an overestimate of [Plaintiff]'s difficulties.

At the initial and reconsideration levels, the reviewing State agency psychological consultants concluded that [Plaintiff]'s mental impairments were associated with the following: moderate limitation in his ability to understand, remember, or apply information; moderate difficulty interacting with others; moderate difficulty maintaining concentration, persistence, or maintaining pace; and moderate difficulty in his ability to adapt or manage himself (Exhibit 3A/3; 4A/3; 7A/3; and 8A/3). I find that these opinions are persuasive to the extent that they demonstrate that more than "moderate" limitations are not warranted and accepts them as a generally accurate representations of [Plaintiff]'s mental status at all relevant periods.

(R. 24–25.)

In this case, the ALJ found Plaintiff did not meet the Paragraph B criteria for either Listing because Plaintiff did not have an extreme limitation in any of the four functional areas or marked limitations in any two of them. Instead, the ALJ found that Plaintiff had no more than moderate limitations in all four functional areas. (R. at 25). Because the ALJ's findings regarding the functional areas are properly addressed and supported by substantial evidence, the ALJ did not err in concluding that Plaintiff did not meet the Paragraph B criteria.

Plaintiff argues that the ALJ failed to "separate out each distinct area of the paragraph B criteria" and to consider relevant evidence that demonstrates Plaintiff's extreme or marked limitations in the four functional areas. (Doc. 10 at 14–18). Plaintiff also offers precedent that warns against "speculat[ing] what the ALJ may have concluded had [she] considered the medical evidence under the criteria" in the relevant listing. *Harvey v. Comm'r of Soc. Sec.*, No. 16-3266, 2017 WL 4216585, at *6 (6th Cir. Mar. 6, 2017); (*see* Doc. 10 at 12–13; Doc. 12 at 2–3).

It is true that an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011). But Plaintiff's contention that the ALJ must "separate out each distinct area of the B criteria" at Step Three overstates the regulations' directive. This Court has noted:

> [A]n ALJ's explanation of her step-three determination need not be elaborate. The Sixth Circuit Court of Appeals has consistently rejected a heightened articulation standard, noting in *Bledsoe v. Barnhart* that the ALJ is under no obligation to spell out "every consideration that went into the step three determination" or "the weight [she] gave each factor in [her] step three analysis," or to discuss every single impairment. 165 F. App'x 408, 411 (6th Cir. 2006). Nor is the procedure so legalistic that the requisite explanation and support must be located entirely within the section of the ALJ's decision devoted specifically to step three; the court in *Bledsoe* implicitly endorsed the practice of searching the ALJ's entire decision for statements supporting his step three analysis. *See id.*

*Kulp v. Commissioner of Social Security*, No. 2:20-CV-6188, 2021 WL 4895342, at *8 (S.D. Ohio Oct. 20, 2021); *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding "the ALJ made sufficient factual findings elsewhere in his decision to support his conclusion at step three").

Here, the Undersigned does not have to speculate or fill in the gaps to understand how the ALJ came to her conclusion. Unlike in *Reynolds* or *Harvey*, the ALJ did not fail to analyze the Listings in question. In other words, the ALJ's opinion provides sufficient explanation for meaningful judicial review. *Cf. Reynolds*, 424 F. App'x at 416 (remanding where the ALJ analyzed whether the plaintiff's mental impairments met or equaled a Listing but "[n]o analysis whatsoever was done as to whether [the plaintiff's] physical impairments . . . met or equaled a Listing"); *Harvey*, No. 16-3266, 2017 WL 4216585, at *6 (remanding where "the ALJ provided no analysis whatsoever as to whether [the plaintiff's] physical impairments met Listing 1.02 despite his introduction concluding they did not" (internal quotation marks omitted)). Importantly, the moderate limitations articulated by the ALJ mirrored those opined by the state agency psychologists—opinions which the ALJ found persuasive. (R. at 25, citing R. at 72, 79, 88, 96; *see also* R. at 33); *cf. Newton v. Comm'r of Soc. Sec.*, No. 5:22-CV-01949-JRA, 2023 WL 6609569, at *12 (N.D. Ohio Sept. 25, 2023) (remanding where "the evidence on which the ALJ relies in support of his [criteria B] findings is not relevant to the areas of mental functioning."), *report and recommendation adopted*, No. 5:22-CV-01949, 2023 WL 6607380 (N.D. Ohio Oct. 10, 2023). And the ALJ expressly considered these opinions as relevant to her Paragraph B conclusion. (R. at 25 ("I find that these opinions are persuasive to the extent that they demonstrate that more than 'moderate' limitations are not warranted and accepts them as a generally accurate representations of the claimant's mental status at all relevant periods."); *see* R. at 72–73 (providing

narrative explanation that marked limitations opined by Dr. Kincaid were not supported or persuasive, and the preponderance of the evidence suggests no more than moderate limitation), 88–89 (same)).  What's more, the ALJ explained why Dr. Kincaid's opinion that Plaintiff had marked limitations in three of the functional areas, discussed in more detail later, did not support a finding that the B criteria were satisfied.  (R. at 25 ("In making these findings [about the B criteria], I considered the June 2021 psychological consultative evaluation report completed by Dr. Kincaid (Exhibit 4F and *described in detail below*) . . . Dr. Kincaid's opinion is no more than partially persuasive and represents and overestimate of [Plaintiff's] difficulties.")).  Accordingly, though her analysis may have been shorter than Plaintiff would have liked, the ALJ properly discussed the Listings.

More still, the ALJ's conclusion was supported by substantial evidence.  In addition to her analysis at Step Three, the ALJ considered an April 2020 clinical record reflecting Plaintiff's mood, energy, sleep, and appetite as good; noting his anxiety was "not too bad;" and highlighting he did not report panic attacks or irritability.  (R. at 29, citing R. at 426).  Additionally, Plaintiff reported that his anxiety medication was "help[ing]," and his clinician indicated his major depressive disorder and generalized anxiety disorder were "well controlled."  (*Id.*, citing R. at 426, 429).  Then in October 2020, Plaintiff was reported as having a "normal memory" and was cooperative, though anxious, during a visit to establish substance abuse and mental health treatment.  (*Id.*, citing R. 453–54).  The ALJ highlighted later that same month, Plaintiff was evaluated as having a "normal affect, calm mood, and attentive behavior."  (*Id.*, citing R. at 497).  Additionally, the ALJ noted that in January 2021, records reflected Plaintiff as having a "stable mood and recent unremarkable drug screen."  (*Id.*, citing R. at 510).  The ALJ further commented that "claimant's apparent work activity during the period at issue" as demonstrated in his medical

records "strongly suggests greater retained vocational ability than alleged, especially given ongoing unremarkable health records." (*Id*, citing R. at 510; *see also* R. at 23 (discussion of records reflecting Plaintiff's work during the relevant period)). Discussed in more detail below, the ALJ also considered Dr. Kincaid's "relatively benign mental status exam inconsistent with the need for total work preclusion." (R. at 30, citing R. at 487–49). Specifically, during the exam Dr. Kincaid "noted that [Plaintiff] was cooperative with logical thought process, an appropriate affect, and anxious mood . . . Dr. Kincaid also indicated an intact memory and no cognitive deficits." (*Id.*, citing R. at 487–90). Generally, although the ALJ acknowledged Plaintiff "requires several long-term mental work restrictions," the mental findings and treatment contained in the record were "not demonstrative of the need for disabling limitations." (R. at 33 (summarizing Plaintiff's treatment and noting medical professionals have generally described "no overt signs of mental distress")).

Plaintiff takes issue with the fact that the ALJ "fail[ed]" to consider certain evidence from the record, including Plaintiff's function report, third party letters from his family, and his subjective complaints—all of which he says demonstrate marked or extreme limitations. (Doc. 10 at 13–18). But "an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Michico K. v. Comm'r of Soc. Sec.*, No. 1:22-CV-416, 2022 WL 17974391, at *4 (S.D. Ohio Dec. 28, 2022) (citing *Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467–68 (6th Cir. 2004)); *see also Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). What's more, the ALJ did consider much of what Plaintiff alleges she failed to. For example, the ALJ acknowledged Plaintiff's subjective complaints multiple times throughout her opinion. Particularly, she discussed Plaintiff's claims that he had difficulty cooking, cleaning, and running errands due to his anxiety.

(R. at 30). And she acknowledged Plaintiff's hearing testimony that his mental health issues prevented him from working and caused "short and long-term memory problems, difficulty around others, isolative behavior, dislike of crowds, difficulty accepting criticism, anxiety, several PTSD-related symptoms, depressed mood, low energy/motivation, and lethargy." (*Id.*). The ALJ additionally noted that Plaintiff claimed to spend "much of his time in bed due to depressive symptoms," and he "alleged a poor memory, poor stress tolerance, difficulty interacting with others, difficulty accepting criticism, poor energy/motivation, and a slow work pace." (R. at 31). The ALJ also expressly considered "third-party statements" provided by Plaintiff's family members but found them unpersuasive because they were not consistent with or supported by the record. (R. at 34).

Plaintiff also pushes back on the ALJ's classifications of his mental evaluations as unremarkable and his counseling and pharmacological treatment as conversative. (Doc. 10 at 17–18). He offers various record evidence as support. (*Id.*). But the law prohibits the Court from re-weighing the evidence and substituting its judgment for the ALJ's. *See Reynolds*, 424 F. App'x at 414 (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995) ("This court reviews the entire administrative record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.")). The Court will not disturb the ALJ's conclusion where, as here, she properly considered the Listings in question and her conclusion is supported by substantial evidence.

### B. Dr. Kincaid's Opinion

Plaintiff next alleges that the ALJ failed to properly discuss the supportability and consistency of Dr. Kincaid's opinion. (Doc. 10 at 18–21). But the Court finds the ALJ's treatment of Dr. Kincaid's opinion sufficient.

16

A claimant's RFC is an assessment of "the most [a claimant can still do despite [her]] limitations." 20 C.F.R. § 404.1545(a)(1) (2012). A plaintiff's RFC assessment must be based on all the relevant evidence in her file. *Id.* The governing regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings. 20 C.F.R. § 404.1513(a)(1)–(5).[1] As for medical opinions and prior administrative findings, an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [the [Plaintiff]'s] medical sources." 20 C.F.R. § 404.1520c(a). Instead, an ALJ must consider: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with the [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." 20 C.F.R. § 404.1520c(c)(1)–(5). Although there are five factors, supportability and consistency are the most important, and the ALJ must explain how they were considered. 20 C.F.R. § 404.1520c(b)(2).

When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other

---

[1] The regulations define prior administrative findings:

A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record ...

§ 404.1513(a)(2), (5).

medical sources and non-medical sources in the claim, the more persuasive the ALJ should find the medical opinion. 20 C.F.R. § 404.1520c(c)(2). And, although an ALJ may discuss how she evaluated the other factors, she is generally not required to do so. *Id.* If, however, an ALJ "find[s] that two or more medical opinions or prior administrative findings about the same issue are both equally well-supported ... and consistent with the record ... but are not exactly the same, [the ALJ will] articulate how [she] considered the other most persuasive factors...." 20 C.F.R. § 404.1520c(b)(3).

The ALJ found Dr. Kincaid's June 2021 opinion was "no more than partially persuasive" and determined that it "represents an overestimate of [Plaintiff's] difficulties." (R. at 34). In coming to this conclusion, the ALJ first considered the supportability of Dr. Kincaid's opinion. The ALJ acknowledged that Dr. Kincaid opined that Plaintiff had "several 'marked' work-related impairments." (R. at 33). However, she noted that the opinion must be "viewed with a grain of salt given the relatively unremarkable nature of his clinical findings" in the report. (*Id.*). As the ALJ explained earlier in this step, at the time Dr. Kincaid evaluated Plaintiff, she "observed a relatively benign mental status examination." (R. at 30, citing R. at 487–90). Specifically, she "noted [Plaintiff] was cooperative with logical thought process, an appropriate affect, and anxious mood . . . Dr. Kincaid also indicated an intact memory and no cognitive deficits." (*Id.*, citing. R. at 487–90). Elsewhere, the ALJ highlighted that though this opinion "describe[s] concerns regarding depression, anxiety, and PTSD . . . clinical findings from this report also describe the claimant as cooperative, pleasant, and displaying no substantial signs of psychosis." (R. at 33, citing R. at 487–90).

The ALJ further noted that "Dr. Kincaid's overall conclusions rely quite heavily on subjective reporting made by [Plaintiff], as opposed to clinical evidence." (R. at 33–34). Plaintiff

correctly points out that Dr. Kincaid was provided "supporting documentation . . . by the Division of Disability" to review as part of her evaluation. (R. at 487; *see* Doc. 10 at 20). But still, as the ALJ explains, there are inconsistencies between Dr. Kincaid's report and the records she possibly reviewed, particularly related to Plaintiff's work history and drug use. (R. at 33). In particular, Dr. Kincaid's June 2021 opinion recorded that "[a]ccording to [Plaintiff] and his medical records, [his mental health symptoms] significantly impair his work and daily functioning. He last worked approximately three years ago." (R. at 488). Yet as the ALJ acknowledged earlier in her opinion, an October 2020 record reported Plaintiff as "lov[ing his] job working cutting down trees." (R. at 496). And in January 2021, a treatment note reflected that Plaintiff's "work as a tree climber continues but work has slowed down for [Plaintiff due to the] winter season." (R. at 510). Moreover, Dr. Kincaid's opinion reported that Plaintiff "has been sober for four years," but the October 2020 record also contained a urine screen wherein Plaintiff tested positive for THC and fentanyl. (*Compare* R. at 489 *with* R. at 496). All told, the ALJ's conclusion that was reasonable in light of the record. Accordingly, the ALJ properly articulated why Dr. Kincaid's opinion was only partially supported by objective evidence and supporting explanations.

The ALJ also considered the consistency of Dr. Kincaid's opinion with the record as a whole. In particular, she highlighted that Dr. Kincaid's opinion of Plaintiff's impairments was inconsistent with the "generally benign mental health treatment records dating back to the alleged onset date." (R. at 33). The ALJ elsewhere described those other records in detail. (R. at 29–30, citing R. at 426–28 (record reflecting Plaintiff's mood, energy, sleep, and appetite were good; his motivation was fair; his anxiety was "not too bad"; he was friendly, cooperative, and appropriate; and he had no reported panic attacks or irritability), 453–56 (mental status examination reflecting Plaintiff was anxious and "high strung," but also that he was cooperative, had good insight, and

his thought content, intellectual functioning, and memory were within normal limits), 497 (treatment record assessing Plaintiff as oriented, with normal affect, calm mood, fine appearance, and attentive behavior), 510 (record reporting Plaintiff was in a "stable mood")).  Further, the ALJ's observations about Dr. Kincaid's opinion being inconsistent with other records as to how long Plaintiff was not working likewise applies to records made after her evaluation.  (R. at 33; *see* R. 23 and 32, citing R at 505 (December 2021 case note reporting Plaintiff was "feeling good and going to work"), 640 (May 2022 counseling note stating that Plaintiff "was off work due to rain.  He is a tree climber and back to the company he had been working with . . . .")).  Additionally, the ALJ commented that Dr. Kincaid's observation of memory and attention/concentration deficits were not reflected elsewhere in the records she discussed.  (R. at 33; *see e.g.*, R. at 29, citing R. at 453–54, 497).  As such, the ALJ properly evaluated the consistency of Dr. Kincaid's opinion with the rest of the record.

One of Plaintiff's primary qualms with the ALJ's analysis is her comment that Dr. Kincaid's report appeared to "rely quite heavily on subjective reporting . . . as opposed to clinical evidence."  (Doc. 10 at 20; *see* R. at 33–34).  Plaintiff argues that his subjective statements are relevant and not a reason to discount the opinion.  (Doc. 10 at 20); *see Foster v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 709, 717 (S.D. Ohio 2019) ("To the extent that the ALJ discounted the treating psychologists' opinions because they relied on Plaintiff's subjective complaints, such an assessment demonstrates a fundamentally flawed understanding of mental impairments.").  But the ALJ did not base her finding solely on this observation.  Rather, as discussed above, the ALJ highlighted aspects of Dr. Kincaid's evaluation and the rest of the record that either do not support or were not consistent with Dr. Kincaid's ultimate opinion.  (R. at 29–34); *see Connie S. v. Comm'r of Soc. Sec.*, No. 2:21-CV-05938, 2023 WL 2477484, at *4 (S.D. Ohio Mar. 13, 2023 (holding a

plaintiff's subjective statements are pertinent but finding no error when the ALJ discredited a medical opinion for other reasons in addition to the doctor's reliance on subjective complaints). Plaintiff also offers aspects of Dr. Kincaid's opinion and other record evidence that support or are consistent with Dr. Kincaid's opined limitations.  (Doc. 10 at 19–21).  Yet "[t]he findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion."  *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

It is worth noting that the ALJ did not wholly discount Dr. Kincaid's opinion—rather, she "addressed most [of] Dr. Kincaid's concerns by limiting [Plaintiff] to simple, routine tasks in a reduced stress environment with limited social interaction."  (R. at 34).  Plaintiff might wish "the ALJ had interpreted the evidence differently."  *Glasgow v. Comm'r of Soc. Sec.*, No. 2:15-CV-1831, 2016 WL 2935666, at *7 (S.D. Ohio May 20, 2016), *report and recommendation adopted*, No. 2:15-CV-01831, 2016 WL 4486936 (S.D. Ohio Aug. 26, 2016), *aff'd*, 690 F. App'x 385 (6th Cir. 2017).  But, again, the law prohibits the Court from re-weighing the evidence and substituting its judgment for the ALJ's.  *See Reynolds*, 424 F. App'x at 414 (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995).  Because the ALJ properly evaluated and articulated the supportability and consistency of Dr. Kincaid's opinion, the ALJ has satisfied the requirements of the regulations.  *See* 20 C.F.R. § 404.1520c(b).

## IV.    CONCLUSION

Based on the foregoing, it is **ORDERED** that Plaintiff's Statement of Errors (Doc. 10) is **OVERRULED** and that judgment be entered in favor of Defendant.

IT IS SO ORDERED.

Date:   August 15, 2024                                  /s/ Kimberly A. Jolson
                                                                    KIMBERLY A. JOLSON
                                                                    UNITED STATES MAGISTRATE JUDGE